# UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS

No. 97-280

STEPHEN L. MCMANAWAY, APPELLANT,

V.

TOGO D. WEST, JR.
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided  September 29, 1999   )

*Sandra E. Booth* was on the briefs for the appellant.

*John H. Thompson,* Acting General Counsel; *Ron Garvin*, Assistant General Counsel; and *Mary Ann Flynn*, Acting Deputy Assistant General Counsel, were on the brief for the appellee.

Before IVERS, STEINBERG, and GREENE, *Judges*.

STEINBERG, *Judge*: The appellant, veteran Stephen L. McManaway, appeals through counsel an October 24, 1996, decision of the Board of Veterans' Appeals (BVA or Board) denying as not well grounded his claims for Department of Veterans Affairs (VA) service-connected disability compensation for bilateral hearing loss and residuals of a right-knee injury. Record (R.) at 4. The appellant has filed a brief and a reply brief, and the Secretary has filed a brief. This appeal is timely, and the Court has jurisdiction pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). For the reasons that follow, the Court will affirm the BVA decision.

## I. Background

The veteran had active service in the U.S. Army from September 1966 to September 1970. R. at 68. He served in the Air National Guard from July 1976 to December 1992. R. at 2. His unit was activated to participate in the Gulf War, in which he served from January 1991 to November 1991. R. at 87-89, 92. As of the time when the record on appeal (ROA) was filed, the veteran had

been awarded service connection for residuals of a left-thumb injury, carpal tunnel syndrome, and hemorrhoids, with a combined disability rating of 10% effective February 12, 1992. R. at 407-10. Those matters are not raised in this appeal.

In 1992, the veteran filed a claim with a VA regional office (RO) for, inter alia, service connection for a right-knee disability and for bilateral hearing loss. R. at 95. The October 24, 1996, BVA decision here on appeal, inter alia, denied both of those claims as not well grounded. R. at 4. (The Board also remanded a third matter that, in light of that remand, is not before the Court. *See Marlow v. West*, 11 Vet.App. 53, 55 (1998) (claims that have been remanded to the VARO are generally not ripe for substantive review).)

### *A. Right-Knee Disability*

As to the right-knee disability, according to medical histories provided by the veteran and contained in VA medical records and service medical records (SMRs), he injured his right knee before his initial period of service during a high school football game. R. at 17, 28. The veteran's June 1966 entrance examination noted that his right knee was "normal", although he had reported that his knee "occ[asionally] slips him". R. at 17. He was deemed to have been qualified for induction. R. at 19. In January 1967, the veteran underwent a physical examination for the purpose of qualification for Officer Candidate School (OCS). R. at 22-29. It was noted that he had "[i]njured both knees" (R. at 23, 25); however, an orthopedic examination, which included an x-ray of both knees, noted: "Views of the knees are within normal limits" (R. at 28). The impression was "old cruciate ligament sprain, healed", and the examiner concluded that the veteran "qualifie[d] for full duty including OCS". *Ibid.*

The veteran's SMRs further indicated that in the summer of 1967, during OCS training, he had been treated on several occasions for knee pain. R. at 31-33. At that time, he reported having had right-knee pain for five years; however, an x-ray report stated that no abnormalities were found. He was treated with muscle relaxants, liniments, and a knee brace, and he was temporarily placed on limited duty. *Ibid.* An orthopedic examination reported full range of motion, no locking, questionable subluxation, tight legs, and "no internal derangement obvious at this time". R. at 33. There are no further SMRs regarding complaints about or treatment of any knee problems during his 1966-70 period of service. *See* R. at 34-51.

2

At the veteran's June 1970 separation physical examination, the examiner noted: "[T]rick knee -- stated [sic] in high school . . . . Condition stated as worsening during service." R. at 54. A subsequent orthopedic examination noted complaints of "occasional locking of [the] knees and pain with swelling after severe exercise." R. at 57. There was no swelling or pain found on the date of examination. Both knees were reported to be "normal". The examiner diagnosed "possible slight weakness in [the] r[ight] anterior cruciate." *Ibid.* A statement signed by the veteran on September 17, 1970, immediately prior to his actual discharge from service, indicated that there had "been no change" in his medical condition since the June 1970 separation examination. R. at 61.

According to the veteran's March 1994 sworn testimony to the RO, he enrolled in the Columbus, Ohio, police academy in 1971 following his 1970 discharge, and experienced knee problems during his training in March 1971. R. at 271. However, he was still deemed to have been suitable for the job of police officer. *Ibid.* While directing traffic in November 1977, he was struck by a car and suffered, inter alia, a right-knee injury. R. at 73, 84. A private medical record, dated February 1978, diagnosed him as having acute tendinitis of the right knee and ruled out internal derangement of the right knee. R. at 70. The examining physician noted that the veteran's x-rays were negative for a fracture or dislocation. He opined that the veteran would be able to "resume regular duties" in approximately one month. *Ibid.*

In February 1992, following his Gulf War service, the veteran filed a claim for VA service-connected compensation for a disability of the right knee. R. at 94-97. The RO then obtained a March 14, 1990, letter (written to an attorney representing the veteran) from a private physician, Dr. Unverferth, who indicated that he had treated the veteran in June 1989 for "the continued complaint of pain and swelling in his right knee." R. at 103. Dr. Unverferth stated:

> Past history is significant in that Stephen McManaway has had numerous injuries to his right knee. These injuries have necessitated two prior arthroscopic surgeries by other surgeons, and then I performed an arthroscopic surgical procedure on August 29, 1988. At that time, we found a very significant traumatic chondral flap off the posterior patellar surface. This, I felt, was a direct result of a direct blow that he had received to the anterior aspect of his knee in an auto accident.

*Ibid.*

Also in connection with the veteran's February 1992 claim, the RO obtained the veteran's Air National Guard service medical records (GSMRs). In a July 1976 medical history provided by the

3

veteran upon his enlistment in the Air National Guard, he checked the "NO" box as to whether he had then or had ever had a "'[t]rick' or locked knee". R. at 120. The clinical evaluation was that his knee was "normal". R. at 122. A May 1978 GSMR indicated that he had complained of right-knee pain after being hit by an automobile in November 1977 and that he had had a knee operation in 1978. R. at 131. The examiner noted "[p]uncture scars" on the veteran's right knee. R. at 132. No other knee problems were reported in his GSMRs. *See* 137-72.

In April 1992, the veteran underwent a VA medical examination. R. at 175-92. The examiner noted a scar on the veteran's right knee, but found that his joints were "without erythema, redness, or limitation of range of motion." R. at 179. The veteran was diagnosed as being obese and having hyperlipidemia. *Ibid.* An orthopedic examination noted his complaints of pain in the right knee and diagnosed "post op injury right knee." R. at 182-83. In July 1992, the RO denied the veteran's right-knee-disability claim. R. at 195-98.

In his June 1993 Substantive Appeal to the Board (VA Form 9), the veteran stated that, although it was true that he had injured his right knee "prior to joining the U.S. Army in 1966", he had "also re-injured and aggravated the injury . . . as an OCS cadet." R. at 230. He stated: "I aggravated the knee many times while on active duty in the Army and while serving in the Air National Guard." *Ibid.* He repeated under oath at a March 1994 RO hearing essentially the same allegations (R. at 267-73), and, after being asked whether he had had "continuing problems with the knee" subsequent to his discharge from service (R. at 270), he responded: "Yes I have had problems with it the rest of my life" (*ibid.*). In the October 24, 1996, BVA decision here on appeal, the Board denied the veteran's knee-disability claim as not well grounded because of a lack of evidence to link the claimed condition to his service. R. at 9-10.

### B. Bilateral Hearing Loss

The veteran's SMRs for his service in the U.S. Army from September 1966 to September 1970 did not contain evidence of any hearing problems (other than an isolated November 1968 finding of wax build-up that was apparently resolved by irrigation of his ears (R. at 42-43)). *See* R. at 16-62. In July 1976, upon enlistment in the Air National Guard, the veteran's hearing was found normal. R. at 121-23.

"[H]earing loss" was first noted in an April 1978 GSMR and was apparently due to

4

"problems with wax in [his] ears". R. at 131. At that time, an audiometric examination was performed that indicated bilateral hearing loss, and an attached medical profile noted under "INDIVIDUAL'S DEFECT(S)", "needs to use hearing protection in noise areas". R. at 133-34. Bilateral hearing loss was also reported in GSMRs dated July 1982 (R. at 147), April 1986 (R. at 157), and May 1990 (R. at 170-72); however, these GSMRs are silent as to etiology. At his March 1994 RO hearing, the veteran described under oath working in the Air National Guard for "16 years" (R. at 261) beginning "during the 1980's" (R. at 273) in the vicinity of jet aircraft engines, which he believed to be the cause of his hearing loss, and testified that he had not had any problems with his hearing prior to that service. R. at 260-61, 273-74.

The veteran's Gulf-War SMRs for February through November 1991 were received by VA in January 1994. R. at 283. They included a March 1991 audiometric test indicating bilateral impaired hearing, along with the following notes: "Member is in the Air National Guard . . . and requested a hearing exam[ination]. Discussed results with member and use of hearing [illegible]." R. at 285. He was fitted with ear plugs, and no follow-up examination was scheduled. *Ibid.*

The veteran's hearing loss was confirmed by a VA examination in April 1992, with no etiology noted. R. at 176. However, the examiner did report "[n]o evidence" of active ear disease or ear infection. R. at 186. The RO denied the veteran's bilateral hearing loss claim in July 1992. R. at 197. In a statement dated March 1996, his service organization representative conceded that "the evidence . . . does not indicate that the veteran was exposed to loud noises or acoustic trauma. Available evidence does indicate [that] over a number of years he had a gradual development of a hearing loss[;] however[,] no substantiation of evidence has been submitted to support the veteran's contention." R. at 426. In the October 24, 1996, BVA decision here on appeal, the Board denied the veteran's hearing-loss claim as not well grounded. R. at 8. The decision indicated that there was no competent medical opinion that showed an etiological relationship between his current hearing loss and a disease or acoustic trauma that occurred on active duty or while he was in the Air National Guard. *Ibid*.

## II. Analysis

"[A] person who submits a claim for benefits under a law administered by the Secretary shall

5

have the burden of submitting evidence sufficient to justify a belief by a fair and impartial individual that the claim is well grounded." 38 U.S.C. § 5107(a). A well-grounded claim is "a plausible claim, one which is meritorious on its own or capable of substantiation. Such a claim need not be conclusive but only possible to satisfy the initial burden of [section 5107(a)]." *Murphy v. Derwinski*, 1 Vet.App. 78, 81 (1990). Generally, for a service-connection claim to be well grounded a claimant must submit evidence of each of the following: (1) Medical evidence of a current disability; (2) medical evidence, or in certain circumstances lay evidence, of in-service incurrence or aggravation of a disease or injury; and (3) medical evidence of a nexus between the asserted in-service injury or disease and the current disability. *See Caluza v. Brown*, 7 Vet.App. 498, 506 (1995), *aff'd per curiam*, 78 F.3d 604 (Fed. Cir. 1996) (table); *see also Elkins v. West*, 12 Vet.App. 209, 213 (1999) (en banc) (citing *Caluza*, *supra*, and *Epps v. Gober*, 126 F.3d 1464, 1468 (Fed. Cir. 1997) (expressly adopting definition of well-grounded claim set forth in *Caluza*, *supra*), *cert. denied sub nom. Epps v. West,* 118 S. Ct. 2348 (1998) (mem.)). Alternatively, either or both of the second and third *Caluza* elements can be satisfied, under 38 C.F.R. § 3.303(b) (1998), by the submission of (a) evidence that a condition was "noted" during service or during an applicable presumption period; (b) evidence showing postservice continuity of symptomatology; and (c) medical or, in certain circumstances, lay evidence of a nexus between the present disability and the postservice symptomatology. *See Savage v. Gober*, 10 Vet.App. 488, 495-97 (1997). The credibility of the evidence presented in support of a claim is generally presumed when determining whether it is well grounded. *See Elkins*, 12 Vet.App. at 219 (citing *Robinette v. Brown*, 8 Vet.App. 69, 75-76 (1995)). The determination whether a claim is well grounded is subject to de novo review by this Court. *See Robinette*, 8 Vet.App. at 74.

### *A. Right-Knee Condition*

At the outset, as to evidence of in-service incurrence or aggravation (the second requirement of *Caluza, supra*) of a knee problem, the veteran's June 1970 discharge examination report does indicate complaints of knee problems and a "possible slight weakness in [the] r[ight] cruciate." R. at 57. But it is not clear that the veteran has met the first *Caluza* requirement, i.e., **medical** evidence of a current right-knee condition. *See Caluza, supra.* The only evidence of the veteran having **current** knee trouble is his own sworn testimony that he has experienced knee problems "the rest of

6

[his] life" following his first period of service. R. at 270. Where the determinative issue involves medical etiology or a medical diagnosis, competent medical evidence that a claim is "plausible" or "possible" is generally required for the claim to be well grounded. *Heuer v. Brown*, 7 Vet.App. 379, 384 (1995); *Grottveit v. Brown*, 5 Vet.App. 91, 93 (1993). Lay testimony cannot provide such medical evidence because lay persons are not competent to offer medical opinions. *See Stadin v. Brown*, 8 Vet.App. 280, 284 (1995); *Grottveit*, 5 Vet.App. at 93; *Espiritu v. Derwinski*, 2 Vet.App. 492, 494-95 (1992). The most recent *medical* evidence is the April 1992 VA medical examination, which noted complaints of pain and tenderness but found full range of motion, no significant crepitus, and no instability. R. at 182. A concurrent x-ray examination revealed "no significant abnormality of the bone, joints or adjacent soft tissue". R. at 188. *But see* R. at 103 (March 1990 letter from Dr. Unverferth indicating his belief that veteran was permanently disabled). Hence, it is not clear that the veteran has submitted current medical evidence of an asserted knee problem. *See Stadin, Heuer, Grottveit*, and *Espiritu*, all *supra.*

Moreover, the veteran has offered no postservice medical evidence of a connection between any current knee problem (and, again, it is not clear to the Court that the veteran actually has a current knee disability) and either the "'[t]rick' or locked knee" noted at the veteran's induction examination (R. at 120), the knee pain that he sustained during OCS training (R. at 230), or the problems noted on the veteran's discharge examination report (R. at 57). Indeed, the appellant appears to concede this point. *See* Brief at 9 (asserting that his claim is well grounded because "appellant's SMRs prove an in[-]service injury and medical diagnosis" and he has "demonstrated a current condition", but not citing to or asserting any evidence of medical nexus); Reply at 2-3 (asserting that relationship between current condition and inservice injury "is one to which a lay person's observation is competent"). A lay opinion as to such a medical relationship is not competent to well ground a claim for service connection. *See Stadin*, *Grottveit*, and *Espiritu*, all *supra.* Hence, the Court holds, on de novo review, that, based on the facts of this case, the veteran's right-knee-disability claim is not well grounded under the criteria set forth in *Caluza, supra. See also Epps*, *Elkins*, and *Robinette*, all *supra.* Because no nexus evidence is present, the Court need not consider the appellant's arguments concerning the presumption of aggravation under 38 U.S.C. § 1153. *See Maxson v. West*, 12 Vet.App. 453, 460 (1999) (noting that presumption of aggravation

7

"applies only to *Caluza* element 2" (incurrence or aggravation during service) and "and only after it has been demonstrated, at the merits stage, that a permanent increase in disability has occurred or, pursuant to [38 C.F.R. §] 3.306(b)(2) [(1998)], has been deemed to have occurred").

Nor does the Court find that the veteran's right-knee-disability claim is well grounded based on a continuity-of-symptomatology analysis. Assuming, without deciding, that there would be sufficient evidence of a current disability, it is not clear on the facts of this case that there is a "plausible" showing of the requisite continuous symptomatology. *Murphy, supra.* The sole evidentiary basis for the asserted continuous symptomatology is the sworn testimony of the veteran himself (R. at 270), and *no* medical evidence indicates continuous symptomatology -- in fact, medical evidence indicates an *absence* of continuous symptomatology. *See* R. at 120, 122 (July 1976 GSMR that reported his knee as "normal" and at which the veteran himself indicated on the patient history that he reported that he did not have knee problems). The only competent evidence of a nexus between the asserted condition and the asserted continuous symptomatology indicated an etiology *other than* the knee pain noted several times during the veteran's service (R. at 103 (March 1990 letter from Dr. Unverferth indicating that the problem that had necessitated the veteran's August 1988 knee surgery "was a direct result of the blow that he had received to the anterior aspect of his knee in an auto accident")). It is true that at the well-groundedness stage the Court will generally consider only evidence in support of the claim, *see Elkins,* 12 Vet.App. at 219 (noting that after reopening claim based on new and material evidence Secretary "must determine" whether claim is well grounded "in terms of all the evidence of record in support of the claim"); *see also Winters v. West*, 12 Vet.App. 203, 206 (1999) (en banc); nonetheless, in a case such as this one, where the veteran's testimony is the only evidence that may serve to well ground the claim and the veteran has made contradictory statements, and where there is medical evidence that shows a lack of continuous symptomatology as well as an intervening cause for the disability, it may well be appropriate to consider the evidence of record that provides a more complete picture of the veteran's disability in determining whether the claim is well grounded. We need not reach that question here, however, because a well-grounded continuity-of-symptomatology claim generally requires medical evidence of a nexus between the continuous symptomatology and the current claimed condition, and the veteran has not submitted any such evidence. *See Savage, supra.* Again, given the nature of the

disability involved, his lay opinion is insufficient in this regard. *See Savage,* 10 Vet.App. at 497 (holding that "medical expertise is required to relate the appellant's present arthritis etiologically to his post-service symptoms"); *see also Stadin*, *Grottveit*, and *Espiritu*, all *supra*.

Accordingly, the Court holds that there is no plausible evidence of a continuous right-knee disability related to the veteran's first period of service and holds, on de novo review, that the claim is also not well grounded under 38 C.F.R. § 3.303(b). *See Savage* and *Robinette,* both *supra.*

### B. Bilateral Hearing Loss

As to the bilateral-hearing-loss claim, in his brief, the appellant appears to make no arguments that his bilateral-hearing-loss claim was well grounded. Similarly, in his reply brief he offers no response to the Secretary's arguments that the claim is not well grounded. Notwithstanding the apparent agreement between the parties on this point, the Court holds, on de novo review, that this claim is not well grounded.

First, there is medical evidence of a current disability that arose after the veteran began serving in the Air National Guard in 1976 and before 1990. R. at 131, 134, 157, 170-72. Next, for the purpose of assessing whether the claim is well grounded, the Court presumes the credibility of the veteran's testimony regarding his having been exposed to jet-aircraft-engine noise during his Air National Guard service. *See Arms v. West*, 12 Vet.App. 188, 195 (1999) (noting that generally "only the evidence in support of the claim is to be considered and generally *a presumption of credibility attaches to that evidence* in order to decide whether or not *any* VA claimant has sustained the claimant's burden of submitting a well-grounded claim under section 5107(a)" (first emphasis added)).

It is not enough, however, for this veteran to submit medical evidence to support a plausible claim of a hearing loss that began during his Air National Guard service, because "section 1131 of title 38 permits service connection for persons on inactive duty [training] only for *injuries*, not *diseases*, incurred or aggravated in line of duty." *Brooks v. Brown*, 5 Vet.App. 484, 485 (1993) (discussing 38 U.S.C. §§ 101(24), 1131); *cf. Paulson v. Brown*, 7 Vet.App. 466, 469-70 (1995) (if claim relates to period of active duty for training, disability must have manifested itself during that period; otherwise, period does not qualify as active military service and claimant does not achieve

veteran status *for purposes of that claim*).  The Court notes that service as "a member of the . . . Air National Guard of any State" is to be considered "'inactive duty training'" when it is "duty (other than full-time duty) under sections 316, 502, 503, 504, or 505 of title 32", United States Code.  38 U.S.C. § 101(23).  In this case, the Board did not make a finding as to the nature of or authority for the veteran's Air National Guard service in terms of the above criteria, and the ROA does not appear to indicate such nature or authority; however, the Court notes that the veteran's orders assigning him to "duty at home station" during the Gulf War cited 32 U.S.C. § 503 (R. at 87).  Moreover, section 101(23) specifically excludes from "inactive duty training" only those Air National Guard members whose service was "(i) work or study performed in connection with correspondence courses, (ii) attendance at an educational institution in an inactive status, or (iii) duty performed as a temporary member of the Coast Guard Reserve."  38 U.S.C. § 101(23).  Here, the veteran's service does not appear to meet any of those three specified exclusions.  Hence, for the purposes of a well-grounded-claim analysis, the Court will assume that the veteran's Air National Guard service was "inactive duty training" under 38 U.S.C. §§ 101(23) and 1131 and *Brooks, supra.  Cf. Cahall v. Brown*, 7 Vet.App. 232, 237 (1994) (noting that official service department records are necessary to establish inactive duty training); *Duro v. Derwinski*, 2 Vet.App. 530, 532 (1992) (Board is bound by official service department determinations of military service).

Assuming, then, that the veteran's claimed condition arose during his inactive duty training, that condition must have been due to an injury and not a disease in order to be compensable under 38 U.S.C. § 1131.  *See Brooks, supra.*  Thus, if the medical records contained in the ROA had indicated that the veteran's hearing loss had been caused by a disease rather than an injury, the Court, assuming inactive-duty-training status, would affirm the Board decision and deny this claim as legally insufficient.  *See Sabonis v. Brown*, 6 Vet.App. 426, 429-30 (1994) (claim denied for lack of legal merit or lack of entitlement).  However, the April 1992 VA examiner, who had been specifically requested to address the question whether "an active ear disease is present" or "an infectious disease of the middle or inner ear is present", noted that "[n]o evidence of active disease was found" and that "[n]o evidence of active ear infection was found".  R. at 186.  The examining physician also added that "[a]udiometry is pending at this time but there is no evidence for an acute ear disease."  *Ibid.*  Based on that April 1992 VA examination record, as well as the fact that no other

medical opinions as to etiology are of record, there is enough evidence with regard to the nature of his service and of acoustic trauma to move forward with the analysis of the well groundedness of his claim for bilateral-hearing loss.

The veteran's claim is based on his 1976 to 1992 Air National Guard service, which, unlike active service, is not continuous; indeed, it is episodic. Unlike active service, where incurrence during service is necessarily incurrence during *active* service, this veteran could have been exposed as a civilian during the July 1976 to December 1990 period before his activation for the Gulf War to loud noises that could have produced hearing loss rather than during those times, from 1976 to 1991, when he was fulfilling his service obligation to the Air National Guard. Thus, even assuming that he was exposed to loud noises, he has not submitted plausible evidence of a hearing loss incurred during his inactive duty for training as the result of such exposure. Moreover, he has submitted no competent evidence to suggest a nexus between his presumed exposure to jet-aircraft noise and his hearing loss. As noted in part II.B., *supra*, his own testimony is insufficient in this regard. *See Stadin, Grottveit*, and *Espiritu*, all *supra*. The lack of such evidence, as well as the lack of clear evidence of in-service incurrence, renders his claim not well grounded under *Caluza*, *supra*, as well as under 38 C.F.R. § 3.303(b) and *Savage, supra. See Boyer v. West*, 11 Vet.App. 477, 478-79 (1998) (requiring nexus evidence to well ground claim for hearing loss under continuity-of-symptomatology analysis); *see also Epps, Elkins*, and *Robinette*, all *supra*.

### C. Stay of Proceedings

On July 13, 1999, the Court issued a stay in this case pending the outcome of *Stuckey v. West*, No. 96-1373 (argued July 29, 1999), an appeal before a panel of this Court that faced similar questions as to the Manual M21-1 provisions cited in the appellant's pleadings. However, on August 24, 1999, the appellant filed through counsel a motion to lift the stay imposed in this case because "the Manual M21-1 argument is of no consequence in the instant case because, if *Morton* [*v. West*, 12 Vet.App. 477 (1999)] is applied, the appellant cannot prevail on that argument." Motion at 1-2. The Court agrees, and on August 26, 1999, the Court granted the appellant's motion to lift the stay.

### III. Conclusion

Upon consideration of the foregoing analysis, the ROA, and the submissions of the parties,

the Court holds that the appellant has not demonstrated that the BVA committed error -- in its findings of fact, conclusions of law, procedural processes, or articulation of reasons or bases -- that would warrant reversal or remand under 38 U.S.C. §§ 1131, 1153, 5107(a), 7104(a), (d)(1), or 7261 or 38 C.F.R. §§ 3.303(b).  Therefore, the Court affirms the October 24, 1996, BVA decision.

AFFIRMED.