http://www.va.gov/vetapp16/Files6/1644966.txt

Citation Nr: 1644966 
Decision Date: 11/30/16 Archive Date: 12/09/16

DOCKET NO. 06-12 124 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Columbia, South Carolina

THE ISSUES

1. Whether new and material evidence has been presented to reopen a claim of entitlement to service connection for hypertension. 

2. Entitlement to service connection for hypertension. 

3. Entitlement to service connection for diabetes mellitus. 

4. Whether new and material evidence has been presented to reopen a claim of entitlement to service connection for a left knee disability. 

5. Entitlement to service connection for a left knee disability.

6. Entitlement to service connection for gum disease to include loss of teeth from dental surgery. 

7. Entitlement to service connection for a left wrist disability.

8. Entitlement to an initial compensable disability rating for pseudofolliculitis barbae.

9. Entitlement to service connection for a hernia.

10. Entitlement to service connection for a neck disability.

11. Entitlement to service connection for a right shoulder disability.

12. Entitlement to service connection for a right wrist disability.

13. Entitlement to service connection for bilateral hearing loss. 

REPRESENTATION

Appellant represented by: South Carolina Office of Veterans Affairs

WITNESS AT HEARING ON APPEAL

Appellant

ATTORNEY FOR THE BOARD

April Maddox, Counsel

INTRODUCTION

The Veteran served on active duty from February 1972 to February 1974 with subsequent service in the Army Reserve for many years. Significantly, the record shows that the Veteran served on temporary active duty in Kuwait in June/July 1994. The Veteran does not report and his service records do not show any service in or near Vietnam during the Vietnam War.

This matter is before the Board of Veterans' Appeals (Board) on appeal of rating decisions dated in January 2006, September 2008, November 2015, March 2016, and June 2016 of the Department of Veterans Affairs (VA) Regional Office (RO) in Columbia, South Carolina. 

Specifically, the January 2006 rating decision denied service connection for diabetes and found that no new and material evidence had been submitted to reopen previously denied claims of entitlement to service connection for hypertension and high cholesterol. 

In November 2006, the Veteran testified at a hearing before a Veterans Law Judge (VLJ) regarding the diabetes, hypertension, and high cholesterol issues. A transcript of the hearing is in the file. 

In a July 2007 decision, the Board determined that new and material evidence had not been presented to reopen the Veteran's claims of entitlement to service connection for hypertension and elevated cholesterol, and denied service connection for diabetes mellitus. The Veteran appealed the July 2007 Board decision to the United States Court of Appeals for Veterans Claims (Court). In a Memorandum Decision, dated in March 2009, the Court vacated the July 2007 Board decision and remanded the matters to the Board for readjudication consistent with the decision. 

In the September 2008 rating decision, the RO determined that new and material evidence had not been presented to reopen claims of entitlement to service connection for a left knee disability and for gum disease to include loss of teeth from dental surgery, and also denied service connection for a left wrist disability. 
In regard to the issue of entitlement to service connection for service connection for gum disease to include loss of teeth, the record reflects that additional relevant service treatment records were associated with the record after the initial denial in April 1998. Specifically, service dental records were received in August 1998 and May 2015. If at any time after VA issues a decision on a claim, VA receives or associates with the claims file relevant official service department records that existed and had not been associated with the claims file when VA first decided the claim, VA will reconsider the claim, notwithstanding the requirement in section 3.156(a) that new and material evidence must be submitted to reopen a claim. 38 C.F.R. § 3.156(c)(1) (2015). The Board finds that relevant service records were associated with the Veteran's claims file after the April 1998 rating decision denying the Veteran's dental claim; as such, the Veteran's claim must be reconsidered. 38 C.F.R. § 3.156(c) (2015).

In January 2009, the Veteran requested a Board hearing regarding the left knee, left wrist, and gum disease issues. In September 2015 correspondence, the Veteran withdrew his Board hearing request and also withdrew his appeal concerning the elevated cholesterol issue. 

In September 2015, the Veteran testified at a hearing before a Decision Review Officer at the RO regarding the hypertension, left knee, left wrist, gum disease, and diabetes issues. 

In the November 2015 rating decision, the RO, in part, granted service connection for pseudofolliculitis barbae assigning a noncompensable disability rating effective January 21, 2015. The RO also denied service connection for hernia, a neck disability, a right shoulder disability, and a right wrist disability.

In the March 2016 rating decision, the RO, in part, denied service connection for bilateral hearing loss. 

In July 2016 correspondence, the Veteran was informed that the VLJ that conducted the November 2006 Board hearing was no longer at the Board and the Veteran was offered a new hearing. Significantly, the Veteran declined a new Board hearing. 

In June 2016 and September 2016 rating decisions, the RO denied service connection for a sinus condition and rhinitis condition. In July 2016 and September 2016, the Veteran entered notices of disagreement with the AOJ as to these decisions. When an NOD has been filed with regard to an issue, and a statement of the case (SOC) has not been issued, the appropriate Board action is to remand the issue to the agency of original jurisdiction for issuance of an SOC. Manlincon v. West, 12 Vet. App. 238 (1999). However, a review of the claims file shows that the AOJ has acknowledged receipt of the NOD and is actively developing that claim. Accordingly, the Board declines to exercise jurisdiction over that claim for Manlincon purposes as no such action on the part of the Board is warranted at this time.

With regard to the gum disease issue, service connection may be awarded for dental conditions for (1) compensation benefits, or (2) outpatient dental treatment purposes. The Board notes that a claim for service connection for a dental condition is also considered to be a claim for VA outpatient dental treatment. Mays v. Brown, 5 Vet. App. 302, 306 (1993). Effective February 29, 2012, the regulations provide that the VBA will adjudicate a claim for service connection of a dental condition for treatment purposes after the Veterans Health Administration (VHA) determines the veteran meets the basic eligibility requirements of 38 C.F.R. § 17.161 and VHA requests that VBA make a determination on questions that include, but are not limited to the following: whether the veteran has former Prisoner of War status; whether the veteran has a compensable or noncompensable service-connected dental condition or disability; whether the dental condition or disability is a result of combat wounds; whether the dental condition or disability is a result of service trauma; or whether the veteran is totally disabled due to a service-connected disability. See Final Rule, Dental Conditions, 77 Fed. Reg. 4469 (Jan. 30, 2012); 38 C.F.R. § 3.381(a) (2014). Review of the record reveals, however, that the agency of original jurisdiction (AOJ) (i.e., VBA) has only adjudicated the issue of entitlement to service connection for a dental disorder for compensation purposes. As there is no indication that any claim for outpatient dental treatment has yet been considered and/or referred to VHA, and because this matter is not currently before the Board, it is referred to the AOJ for appropriate action.

This appeal is being processed utilizing the paperless, electronic Veterans Benefits Management System (VBMS) and the Virtual VA claims processing systems. 

The reopened issues of entitlement to service connection for hypertension and a left knee disability as well as the issues of entitlement to service connection for disabilities of the left wrist, neck, right shoulder, right wrist, and hearing loss are addressed in the REMAND portion of the decision below and are REMANDED to the AOJ.

FINDINGS OF FACT

1. Service connection for hypertension was denied in a May 1998 rating decision.

2. With regard to the claim of entitlement to service connection for hypertension, evidence added to the record since the May 1998 decision is not cumulative or redundant of the evidence of record at the time of the decision, relates to an unestablished fact necessary to substantiate the claim, and triggers VA's duty to assist by obtaining a medical opinion which might raise a reasonable possibility of substantiating the claim.

3. Service connection for a left knee disability was denied in an April 1998 rating decision.

4. With regard to the claim of entitlement to service connection for a left knee disability, evidence added to the record since the April 1998 decision is not cumulative or redundant of the evidence of record at the time of the decision, relates to an unestablished fact necessary to substantiate the claim, and triggers VA's duty to assist by obtaining a medical opinion which might raise a reasonable possibility of substantiating the claim.

5. The Veteran did not set foot on land or serve in the inland waters of Vietnam during the Vietnam era and there is no evidence that the Veteran was exposed to herbicides in service. 

6. The probative evidence does not show that the Veteran's diabetes manifested to a compensable degree within a year of his separation from active service or resulted in a continuity of symptomatology since that time, nor did his type II diabetes manifest during a period of ACDUTRA.

7. There is no probative evidence of a hernia during active service or a period of ACDUTRA and no competent medical evidence linking the Veteran's current residuals of a hiatal hernia with his period of active service.

8. The Veteran did not sustain in-service trauma or disease (such as osteomyelitis) that caused a loss of substance of the body of the maxilla or mandible, resulting in a loss of teeth; his dental disability manifested by periodontal disease and loss of teeth is not a disability for which VA disability compensation is payable.

9. The Veteran's pseudofolliculitis barbae has not involved more than 5 percent of the entire body and/or more than 5 percent of exposed areas affected and has not required systemic therapy. Furthermore, the schedular criteria are adequate to rate the skin disability under consideration at points pertinent to this appeal.

CONCLUSIONS OF LAW

1. The May 1998 rating decision in which the RO denied service connection for hypertension and the April 1998 rating decision in which the RO denied service connection for a left knee disability are final. 38 U.S.C.A. § 7105(c) (West 2014); 38 C.F.R. §§ 3.104, 20.302, 20.1103 (2015).

2. As pertinent evidence received since the May 1998 and April 1998 rating actions is new and material, the requirements for reopening the claims for service connection for hypertension and a left knee disability are met. 38 U.S.C.A. § 5108 (West 2014); 38 C.F.R. § 3.156 (2015).

3. The criteria for service connection for diabetes mellitus have not been met. 38 U.S.C.A. §§ 1110, 1112, 1116, 5107(b) (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.304, 3.307(a)(6), 3.309(e) (2015).

4. Service connection for a hernia is not established. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309 (2015).

5. The criteria for establishing service connection for a dental condition for compensation purposes have not been met. 38 U.S.C.A. §§ 1110, 5107 (West 2014); 38 C.F.R. §§ 3.303, 3.381, 4.150 (2015).

6. The criteria for an initial compensable disability rating for pseudofolliculitis barbae are not met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 3.321, 4.7, 4.31, 4.118, DC 7806 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Due Process Considerations

With respect to the Veteran's claims herein, VA has met all statutory and regulatory notice and duty to assist provisions. See 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326 (2015); see also Scott v. McDonald, 789 F.3d 1375 (Fed. Cir. 2015).
 
Specifically, the Board finds that VA has satisfied its duty to notify under the Veterans Claims Assistance Act (VCAA) by way of November 2005 (diabetes), December 2007 (gum disease), March 2008 (gum disease), January 2010 (diabetes), April 2010 (diabetes), August 2010 (diabetes), and July 2015 (hernia/pseudofolliculitis) letters which were sent either prior to the initial unfavorable decisions or prior to readjudication of the case. Such letters advised the Veteran of the evidence and information necessary to substantiate his claim. Furthermore, the Veteran was informed of his and VA's respective responsibilities in obtaining such evidence and information. Additionally, such letters advised him of the information and evidence necessary to establish a disability rating and an effective date in accordance with Dingess/Hartman v. Nicholson, 19. Vet. App. 473 (2006). 

Relevant to the duty to assist, the Veteran's service and reserve treatment records and post-service private as well as VA treatment records have been obtained and considered. The Veteran has not identified any additional, outstanding records that have not been requested or obtained. 

With regard to the Veteran's service connection claim for diabetes and hernia, a medical opinion is not necessary to decide the claim. As explained below, there is no medical evidence or credible lay evidence that the Veteran had either diabetes or a hernia during service or for many years after his discharge. Thus, the Board is not required to afford the Veteran the opportunity to undergo a VA compensation examination for a medical nexus opinion in support of his service connection claim for diabetes and/or hernia. McLendon v. Nicholson, 20 Vet. App. 79 (2006); 38 U.S.C.A. § 5103A (d) and 38 C.F.R. § 3.159 (c)(4).

With regard to the pseudofolliculitis barbae issue, the Veteran was afforded VA skin examinations in September 2015 to determine the nature and severity of this disability. Neither the Veteran nor his representative has alleged that such VA examination is inadequate for rating purposes. The Board finds that this examination is adequate in order to evaluate the Veteran's service-connected pseudofolliculitis barbae as it includes an interview with the Veteran, a review of the record, and full examination, addressing the relevant rating criteria. Moreover, neither the Veteran nor his representative has alleged that his disability has worsened in severity since the September 2015 VA examination. Rather, they argue that the evidence reveals that the Veteran's disability has been more severe than the currently assigned rating for the duration of the appeal period. Palczewski v. Nicholson, 21 Vet. App. 174 (2007) (the passage of time alone, without an allegation of worsening, does not warrant a new examination). Therefore, the Board finds that the examination report of record is adequate to adjudicate the Veteran's increased rating claim and no further examination is necessary.

The Veteran also offered testimony before a VLJ at a Board hearing in November 2006. In Bryant v. Shinseki, 23 Vet. App. 488 (2010), the Court held that 38 C.F.R. § 3.103 (c)(2) requires that the Decision Review Officer or VLJ who chairs a hearing to fulfill two duties: (1) the duty to fully explain the issues and (2) the duty to suggest the submission of evidence that may have been overlooked. 

Here, during the November 2006 hearing, the VLJ identified the issues on appeal which, at that time, included the issue of entitlement to service connection for diabetes. Also, information was solicited regarding the Veteran's in-service experiences which he alleges resulted in his current diabetes, the type and onset of symptoms, and his contention that his military service caused his disorder. Furthermore, the VLJ informed the Veteran of the evidence necessary to substantiate his claim and inquired about outstanding records. Therefore, not only was the issue "explained . . . in terms of the scope of the claim for benefits," but "the outstanding issues material to substantiating the claim," were also fully explained. See Bryant, 23 Vet. App. at 497. Therefore, the Board finds that the hearing discussion did not raise the possibility that there is outstanding evidence necessary for a fair adjudication of the claim. Under these circumstances, nothing gives rise to the possibility that evidence had been overlooked with regard to the Veteran's claim decided herein. As such, the Board finds that, consistent with Bryant, the VLJ complied with the duties set forth in 38 C.F.R. 3.103 (c)(2) and that the Board may proceed to adjudicate the claim based on the current record.

The Board also finds that the AOJ has substantially complied with the Board's February 2010 remand directives. Specifically, the AOJ reconsidered VA treatment records dated from April 2006 to March 2007 and scheduled the Veteran for a Board hearing regarding the issues concerning the left knee, gum disease, and left wrist. Therefore, the Board finds that the AOJ has substantially complied with the February 2010 remand directives such that no further action is necessary in this regard. See D'Aries v. Peake, 22 Vet. App. 97, 105 (2008); Dyment v. West, 13 Vet. App. 141, 146-47 (1999) (remand not required under Stegall v. West, 11 Vet. App. 268 (1998), where the Board's remand instructions were substantially complied with), aff'd, Dyment v. Principi, 287 F.3d 1377 (2002).

II. New and Material Evidence Analysis

When a Veteran seeks to reopen a final decision, the first inquiry is whether the evidence presented or secured since the last final disallowance of the claim is "new and material." If new and material evidence is presented or secured with respect to a claim that has been finally disallowed, the claim shall be reopened and reviewed. See 38 U.S.C.A. § 5108; 38 C.F.R. § 3.156. When determining whether a claim should be reopened, the credibility of the newly submitted evidence is presumed. See Justus v. Principi, 3 Vet. App. 510 (1992). 

"New" evidence is defined as existing evidence not previously submitted to agency decisionmakers. "Material" evidence means existing evidence that, by itself or when considered with previous evidence of record, relates to an unestablished fact necessary to substantiate the claim. New and material evidence can be neither cumulative nor redundant of the evidence of record at the time of the last prior final denial of the claim sought to be reopened, and must raise a reasonable possibility of substantiating the claim. 38 C.F.R. § 3.156(a).

In Shade v. Shinseki, 24 Vet. App. 110 (2010), the Court indicated that new and material evidence could be found where the new evidence would raise a reasonable possibility of substantiating the claim if, when considered with the old evidence, it would at least trigger the Secretary's duty to assist by providing a medical opinion.

A. Hypertension

Service connection for hypertension was last denied in a May 1998 rating decision on the basis that hypertension was not shown during the Veteran's active service from February 1972 to February 1974. No additional relevant evidence was received within the one-year appeal period following the May 1998 rating decision, and no additional service records (warranting reconsideration of the claim) have been received since that time. See 38 C.F.R. § 3.156(b), (c). Hence, the May 1998 denial of service connection for hypertension is final (38 U.S.C.A. § 7105 and 38 C.F.R. §§ 3.104, 20.302, 20.1103) and is not subject to revision on the same factual basis (38 U.S.C.A. § 5108 and 38 C.F.R. § 3.156). Accordingly, the pertinent inquiry with respect to this matter is whether new and material evidence has been received since that decision, warranting reopening of the claim.

At the time of the May 1998 rating decision, the pertinent evidence of record consisted of the Veteran's service treatment records and post-service Reserve records. Service treatment records for the Veteran's period of active duty from 1972 to 1974 contained no complaint, clinical finding, or diagnosis of hypertension. Service treatment records for the Veteran's Reserve service, covering the period of 1974 to 1998, show that the Veteran had findings of high blood pressure at the time of physical examinations in May and June 1992 and in March and April 1994. At the time of earlier physical examinations in July 1986 and April 1990, the reports noted mild hypertension.

The Veteran submitted an application to reopen his claim of entitlement to service connection for hypertension in October 2005. Since the May 1998 rating decision, the evidence includes private and VA medical records, and lay statements/testimony from the Veteran. This evidence is "new," as it was not previously considered by the RO. This evidence is also "material" as it includes statements from Dr. J.L. dated in July 2009, November 2009, November 2013, and August 2015 which relate the Veteran's hypertension to the Veteran's military service. Unfortunately, there is no explanation as to whether the Veteran's hypertension is related to his active military service or subsequent Reserve service and no rationale for the opinion. 

As the newly submitted evidence includes competent evidence of a possible nexus between the Veteran's hypertension and military service, it relates to an unestablished fact necessary to substantiate the claim. The claim of service connection for hypertension is reopened due to the receipt of new and material evidence. See 38 U.S.C.A. § 5108; 38 C.F.R. § 3.156(a). The reopened claim is addressed further in the remand section. 

 B. Left knee disability

Service connection for a left knee disability was last denied in an April 1998 rating decision on the basis that a left knee disability subject to service connection was not shown in service. No additional relevant evidence was received within the one-year appeal period following the April 1998 rating decision, and no additional service records (warranting reconsideration of the claim) have been received since that time. See 38 C.F.R. § 3.156(b), (c). In this regard, the Board notes that while additional reserve treatment records were added to the file after the April 1998 rating decision, they were not relevant or material as they do not relate to a claimed in-service event, injury, or disease. 38 C.F.R. § 3.156(b), (c). Hence, the April 1998 denial of service connection for a left knee disability is final (38 U.S.C.A. § 7105 and 38 C.F.R. §§ 3.104, 20.302, 20.1103) and is not subject to revision on the same factual basis (38 U.S.C.A. § 5108 and 38 C.F.R. § 3.156). Accordingly, the pertinent inquiry with respect to this matter is whether new and material evidence has been received since that decision, warranting reopening of the claim.

At the time of the April 1998 rating decision, the pertinent evidence of record consisted of the Veteran's service treatment records and post-service Reserve records. Such records are negative for left knee symptomatology. 

The Veteran submitted an application to reopen his claim of entitlement to service connection for a left knee disability in November 2007. Since the April 1998 rating, the evidence includes private and VA medical records, and lay statements/testimony from the Veteran. This evidence is "new," as it was not previously considered by the RO. It is also "material" in that there are VA treatment records showing an impression of degenerative joint disease of the left knee as early as November 2007 and a January 2012 operative report showing repair of a left knee medial meniscus tear. There are also statements from Dr. J.L. dated in July 2009, November 2009, November 2013, and August 2015 which relate the Veteran's left knee disability to the Veteran's military service. Unfortunately, there is no explanation as to whether the Veteran's left knee disability is related to his active military service or subsequent Reserve service and no rationale for the opinion. 

As the newly submitted evidence includes competent evidence of a current left knee disability as well as a possible nexus between the Veteran's left knee disability and military service, it relates to an unestablished fact necessary to substantiate the claim. The claim of service connection for a left knee disability is reopened due to the receipt of new and material evidence. See 38 U.S.C.A. § 5108; 38 C.F.R. § 3.156(a). The reopened claim is addressed further in the remand section. 

III. Service Connection Analysis

Service connection may be granted if the evidence demonstrates that a current disability resulted from an injury or disease incurred or aggravated in active military service. 38 U.S.C.A. §§ 1110, 1131 (West 2014); 38 C.F.R. § 3.303(a) (2015). In general, service connection requires competent and credible evidence of (1) a current disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a nexus between the claimed in-service disease or injury and the current disability. See Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

Under 38 C.F.R. § 3.303(b), an alternative method of establishing the second and third elements is through a demonstration of continuity of symptomatology. Barr v. Nicholson, 21 Vet. App. 303 (2007); see Savage v. Gober, 10 Vet. App. 488, 495-97 (1997); see also Clyburn v. West, 12 Vet. App. 296, 302 (1999). Continuity of symptomatology may be established if a claimant can demonstrate (1) that a condition was "noted" during service; (2) evidence of post- service continuity of the same symptomatology; and (3) medical or, in certain circumstances, lay evidence of a nexus between the present disability and the post-service symptomatology. Savage, 10 Vet. App. at 495-96; see Hickson v. West, 12 Vet. App. 247, 253 (lay evidence of in-service incurrence is sufficient in some circumstances for purposes of establishing service connection); 38 C.F.R. § 3.303(b).

However, in Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013), the Federal Circuit held that the theory of continuity of symptomatology can be used only in cases involving those conditions explicitly recognized as chronic by 38 C.F.R. § 3.309(a). Walker v. Shinseki, 708 F.3d 1331, 1337-39 (Fed. Cir. 2013). For disabilities that are not listed as chronic, the only avenue for service connection is by showing in-service incurrence or aggravation under 38 C.F.R. § 3.303(a), or by showing that a disease that was first diagnosed after service is related to service under 38 C.F.R. § 3.303(d). Diabetes mellitus and sensorineural hearing loss are recognized as chronic conditions by 38 C.F.R. § 3.309(a).

Active military, naval, or air service includes any period of ACDUTRA during which the individual concerned was disabled or died from a disease or injury incurred in or aggravated in line of duty or period of INACDUTRA during which the individual concerned was disabled or died from injury incurred in or aggravated in line of duty. 38 U.S.C.A. § 101 (21) and (24); 38 C.F.R. § 3.6 (a) and (d). ACDUTRA is, inter alia, full-time duty in the Armed Forces performed by Reserves for training purposes. 38 C.F.R. § 3.6 (c)(1).

Certain chronic diseases, including diabetes mellitus and sensorineural hearing loss, may be presumed to have been incurred in or aggravated by service if manifest to a compensable degree within one year of discharge from service. See 38 U.S.C.A. §§ 1101, 1112 (West 2014); 38 C.F.R. §§ 3.307, 3.309 (2015). 

The evidentiary presumptions of sound condition at entrance to service (38 U.S.C.A. § 1111; 38 C.F.R. § 3.304 (b)) and aggravation during service of preexisting diseases or injuries that undergo an increase in severity during service (38 C.F.R. § 3.306) do not extend to those whose service connection claim is based on a period of ACDUTRA or INACDUTRA. Smith, 24 Vet. App. at 44-45; Paulson v. Brown, 7 Vet. App. 466, 470-71 (1995) (noting that the Board did not err in not applying presumptions of sound condition and aggravation to appellant's claim where he served only on ACDUTRA and had not established any service-connected disabilities from that period); Acciola v. Peake, 22 Vet. App. 320, 324 (2008); McManaway v. West, 13 Vet. App. 60, 67 (citing Paulson, 7 Vet. App. at 469-70, for the proposition that, "if a claim relates to period of [ACDUTRA], a disability must have manifested itself during that period; otherwise, the period does not qualify as active military service and claimant does not achieve Veteran status for purposes of that claim.")

A. Diabetes Mellitus

The Veteran's service treatment records are negative for a diagnosis of or treatment for diabetes mellitus. Additionally, as the record does not show and the Veteran does not contend that he served in the Republic of Vietnam, service connection for diabetes mellitus cannot be granted on a presumptive basis based on exposure to herbicides. See 38 C.F.R. §§ 3.307, 3.309 (2015). 

The Veteran contends that his current diabetes mellitus was incurred and/or aggravated during his ACDUTRA service. During the November 2006 Board hearing, the Veteran testified that he was first diagnosed with diabetes in 2000/2001 but was told that he had elevated blood sugar as early as 1992 during a Reserves physical. He also testified that his 20 plus years in the Army Reserves (including a month-long deployment to Kuwait in 1994) caused/aggravated his diabetes. Later, during the September 2015 RO hearing, the Veteran testified that he was diagnosed with diabetes in 1994. 

The Veteran's service treatment records from his active duty service as well as his subsequent Reserve service are negative for a diagnosis of diabetes mellitus. The Veteran was diagnosed with diabetes mellitus in approximately April 2001. Significantly, an April 2001 private treatment record shows an impression of "diabetes, new onset." 

As noted above, the Veteran separated from active service in 1974 and retired from Reserve service in 1998. The Board notes that diabetes mellitus is a disease; therefore, service connection can be granted only if diabetes mellitus was incurred when the Veteran was on active duty or ACDUTRA. See 38 U.S.C.A. §§ 101 (2), (24), 1110 (West 2014); 38 C.F.R. § 3.6 (2015). As the Veteran must have been on a period of active duty or ACDUTRA when diabetes mellitus was incurred, the date of such incurrence is key to determining whether service connection is warranted.

The Board finds that the evidence does not persuasively support a finding that the Veteran was within one year of discharge of a period of active service or in a period of ACDUTRA when he was diagnosed with diabetes mellitus in April 2001. While the Veteran may have had elevated blood sugar during his Reserve service, he was not actually diagnosed with diabetes until approximately three years following his active service.

It is acknowledged that the Veteran is competent to give evidence about his observable symptomatology. Layno v. Brown, 6 Vet. App. 465 (1994). It is further acknowledged that lay evidence concerning continuity of symptoms after service, if credible, is ultimately competent, regardless of the lack of contemporaneous medical evidence. Buchanan v. Nicholson, 451 F.3d 1331 (Fed. Cir. 2006). Here, however, the Veteran has not alleged that he began feeling symptoms of diabetes during military service or within one year of active service. For these reasons, continuity of symptomatology has not here been established, either through the competent evidence or through the Veteran's statements. 

The Veteran's claim for service connection includes his own assertion that his diabetes is related to military service. As a lay person, the Veteran is competent to relate some symptoms that may be associated with diabetes but he does not have the requisite medical knowledge, training, or experience to be able to diagnose the medically complex disorder of diabetes, and opine on its etiology. See Kahana v. Shinseki, 24 Vet. App. 428, 437 (2011) (recognizing ACL injury is a medically complex disorder that requires a medical opinion to diagnose and to relate to service or differentiate from in-service symptoms and diagnosis). Diabetes mellitus is a medically complex disease process because it requires specialized testing to diagnose and manifests observable symptomatology that may overlap with other disorders. Woehlaert v. Nicholson, 21 Vet. App. 456, 462 (2007) (holding that rheumatic fever is not a condition capable of lay diagnosis). Thus, medical evidence on this point is required.

The preponderance of the evidence is against the claim for service connection for diabetes mellitus and the benefit of the doubt rule does not apply. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102.

B. Hernia

The Veteran's service treatment records from his active duty service from 1972 to 1974 are negative for findings related to a hernia in service. Significantly, the Veteran's February 1972 enlistment examination and his October 1973 separation examination both show normal "abdomen and viscera (Include hernia)." Furthermore, the Veteran denied "rupture/hernia" in February 1972 and October 1973 reports of medical history.

Reserve treatment records are also negative for findings related to a hernia. Specifically, examination reports dated in March 1978, February 1982, July 1986, April 1990, May 1992, and March 1994 show normal "abdomen and viscera (Include hernia)." In fact, the May 1992 VA examination report specifically notes "no hernia." Furthermore, the Veteran denied "rupture/hernia" in March 1978, February 1982, July 1986, April 1990, May 1992, and March 1994 reports of medical history.

VA treatment records are negative for treatment or diagnosis of a hernia with the exception of a March 2014 Gulf War Examination notes a history of hiatal hernia. 

The Veteran contends that he experienced a hernia during active duty service. However, he has not explained where/when/how he experienced this hernia and has not provided any nexus opinion relating any residuals of a hernia to his military service. 

The Board finds that the preponderance of the evidence is against service connection for residuals of a hernia. First, there is no evidence of a hernia in service. As noted above, the Veteran's active service and reserve examinations show normal "abdomen and viscera (include hernia)" and the Veteran specifically denied "rupture/hernia" in reports of medical history during that same time frame. In fact, there is no record of a hernia until March 2014, approximately 40 years after active service and 16 years after Reserve service. Such a lapse of time is a factor for consideration in deciding a service connection claim. Maxson v. Gober, 230 F.3rd 1330, 1333 (Fed. Cir. 2000). Finally, there is no medical evidence in the record that links the Veteran's residuals of a hiatal hernia to an incident of the Veteran's active military service. 

The Veteran's claim for service connection includes his own assertion that his hiatal hernia is related to military service. Lay evidence may be competent on a variety of matters concerning the nature and cause of disability. Jandreau v. Shinseki, 492 F.3d 1372, 1377 n.4 (Fed. Cir. 2007). The Veteran's lay testimony, however, is not competent to relate his current hernia disability to service. The causes of hernias are not within the ordinary knowledge of a lay person. The Veteran has not demonstrated any experience with hernias that would allow him to recognize one in service or identify its cause. Rather, medical evidence on this point is required.

The preponderance of the evidence is against the claim for service connection for residuals of a hernia and the benefit of the doubt rule does not apply. 38 U.S.C.A. § 5107; 38 C.F.R. § 3.102.

 C. Gum disease

Service connection for "gum disease (mouth surgery)" was last denied in an April 1998 rating decision on the basis that treatable carious teeth, replaceable missing teeth, dental or alveolar abscesses, periodontal disease (pyorrhea), and Vincent's stomatitis are not disabling conditions, and may be considered service-connected solely for the purpose of determining entitlement to dental examinations or outpatient dental treatment. 

Service dental records show that in December 1973 the Veteran had severe periodontal disease and numerous teeth were extracted. 

The Veteran testified during the September 2015 RO hearing that he had multiple teeth pulled in service that were not replaced. This caused his teeth to shift and, post-service, he lost the rest of his teeth. The Veteran testified that his dentist told him that the military should have replaced the teeth that they extracted during his military service and that this would have prolonged the life of the Veteran's remaining teeth. 

While service connection may be awarded for missing teeth due to dental trauma or bone loss in service, the record does not show and the Veteran does contend that he experienced in-service dental trauma. Significantly, the law mandates the term "service trauma" does not include the intended effects of therapy or restorative dental care and treatment provided during a veteran's active service. See 38 C.F.R. § 3.306(b)(1); VAOGCPREC 5-97. 

Under current VA regulations, compensation is only available for certain types of dental and oral conditions listed under 38 C.F.R. § 4.150. These conditions include various problems of the maxilla, mandible, or temporomandibular articulation, loss of whole or part of the ramus, loss of the condyloid process or coronoid process, loss of the hard palate, or loss of teeth due to loss of substance of the body of the maxilla or mandible due to trauma or disease such as osteomyelitis rather than as a result of periodontal disease. 38 C.F.R. § 4.150. Treatable carious teeth, replaceable missing teeth, dental or alveolar abscesses, and periodontal disease are not considered disabling conditions, and may be considered service connected solely for establishing eligibility for VA outpatient dental treatment. See 38 C.F.R. §3.381(a).

Having carefully considered the Veteran's contentions in light of the evidence recorded and the applicable law, the Board finds that service connection for a dental condition for compensation purposes is not warranted.

The Veteran is seeking service connection for a dental disability manifested by periodontal disease and loss of teeth. The Veteran's dental conditions do not constitute an injury for which compensation may be granted. As noted above, treatable carious teeth, replaceable missing teeth, dental or alveolar abscesses, and periodontal disease are not considered disabling conditions, and may be considered service connected solely for establishing eligibility for VA outpatient dental treatment. See 38 C.F.R. §3.381(a). In this regard, the Board notes that VA regulations specifically provide that loss of teeth from loss of the alveolar process as a result of periodontal disease is not considered disabling. See 38 C.F.R. § 4.150, Diagnostic Code 9913, Note. 

Based on the foregoing, the Board finds that the preponderance of the evidence shows that the Veteran did not experience trauma that caused a loss of substance of the body of the maxilla or mandible, resulting in a loss of teeth; or a disease (such as osteomyelitis, but not periodontal disease) that caused a loss of substance of the body of the maxilla or mandible, resulting in a loss of teeth. Nor does the Veteran have a disability set forth in 38 C.F.R. § 4.150, such as chronic osteomyelitis or osteoradionecrosis of the maxilla or mandible, loss of the mandible, nonunion and malunion of the mandible or maxilla, temporomandibular articulation or limited jaw motion, loss of the ramus, loss of the condyloid process, or loss of the hard palate. As a result, the Veteran is not entitled to compensable service connection for a dental condition because he does not have a disability recognized for service connection purposes.

In reaching this decision, the Board has considered the doctrine of reasonable doubt; however, as the preponderance of the evidence is against the Veteran's claim, that doctrine is not for application. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

IV. Increased Rating Analysis

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities, found in 38 C.F.R., Part 4. The rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service. The ratings are intended to compensate, as far as can practicably be determined, the average impairment of earning capacity resulting from such diseases and injuries and their residual conditions in civilian occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1. 

Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise the lower rating will be assigned. 38 C.F.R. 
§ 4.7. All benefit of the doubt will be resolved in the Veteran's favor. 38 C.F.R. 
§ 4.3.

"Staged ratings" or separate ratings for separate periods of time may be assigned based on the facts found following the initial grant of service connection. Fenderson v. West, 12 Vet. App. 119 (1999). In order to evaluate the level of disability and any changes in severity, it is necessary to consider the complete medical history of the Veteran's disability. Schafrath v. Derwinski, 1 Vet. App. 589 (1991). However, where an increase in the level of a service-connected disability is at issue, the primary concern is the present level of disability. Francisco v. Brown, 7 Vet. App. 55 (1994). Nevertheless, a claimant may experience multiple distinct degrees of disability that might result in different levels of compensation from the time the increased rating claim was filed until a final decision is made. Hart v. Mansfield, 21 Vet. App. 505 (2007). Reasonable doubt as to the degree of disability will be resolved in the Veteran's favor. 38 C.F.R. § 4.3.
 
Service treatment records show that the Veteran was diagnosed and treated for bumps under his chin secondary to shaving in November 1972. In May 2015, the Veteran submitted a claim for service connection for "skin on face." He was afforded a VA examination in September 2015 which noted a current diagnosis of pseudofolliculitis barbae. By rating decision dated in November 2015, the RO granted service connection for pseudofolliculitis barbae, assigning a noncompensable disability rating for this disability effective January 21, 2015. The Veteran disagreed with this decision and subsequently perfected an appeal.

A. Schedular Consideration

The Veteran's pseudofolliculitis barbae is rated under 38 C.F.R. § 4.118, DC 7820-7806. Pursuant to 38 C.F.R. § 4.27, hyphenated diagnostic codes are used when a rating under one diagnostic code requires use of an additional diagnostic code to identify the basis for the evaluation assigned; the additional code is shown after the hyphen. Here, the use of DCs 7820-7806 reflects that the Veteran's pseudofolliculitis barbae is rated as an infection of the skin not listed elsewhere in the diagnostic codes pertaining to the rating of skin disabilities codified at 38 C.F.R. § 4.118 under DC 7820 and that the rating assigned is based on the criteria for rating dermatitis under DC 7806.

Under DC 7820, infections of the skin not listed elsewhere (including bacterial, fungal, viral, treponemal and parasitic diseases) are rated as disfigurement of the head, face, or neck (DC 7800), scars (DCs 7801, 7802, 7803, 7804, or 7805), or dermatitis (DC 7806), depending upon the predominant disability. 38 C.F.R. § 4.118, DC 7820.

Under the criteria of DC 7806, dermatitis or eczema covering less than 5 percent of the entire body, affecting less than 5 percent of exposed areas; and requiring no more than topical therapy during the past 12-month period warrants a noncompensable rating. Dermatitis or eczema covering at least 5 percent, but less than 20 percent, of the entire body; affecting at least 5 percent, but less than 20 percent, of exposed areas; of requiring intermittent systemic therapy such as corticosteroids or other immunosuppressive drugs for a total duration of less than six weeks during the past 12- month period warrants a 10 percent rating. Dermatitis or eczema covering 20 to 40 percent of the entire body, affecting 20 to 40 percent of exposed areas, or requiring systemic therapy such as corticosteroids or other immunosuppressive drugs for a total duration of six weeks or more, but not constantly, during the past 12-month period warrants a 30 percent rating. Dermatitis or eczema warrants a 60 percent rating if it covers more than 40 percent of the entire body, more than 40 percent of exposed areas are affected, or if constant or near-constant systemic therapy such as corticosteroids or other immunosuppressive drugs have been required during the past 12-month period. 38 C.F.R. § 4.118, DC 7806. 

Additionally, dermatitis can alternatively be rated as disfigurement of the head, face or neck (DC 7800) or scars (DC's 7801-7805) depending upon the predominant disability. 38 C.F.R. § 4.118, DC 7806. Under DC 7800 for burn scars, scars due to other causes, or other disfigurement, of the head, face, or neck, a 10 percent rating is warranted for one characteristic of disfigurement. A 30 percent rating is for application when there is visible or palpable tissue loss and either gross distortion or asymmetry of one feature or paired set of features (nose, chin, forehead, eyes (including eyelids), ears (auricles), cheeks, lips); or with two or three characteristics of disfigurement. A 50 percent rating is warranted when there is visible or palpable tissue loss and either gross distortion or asymmetry of two features or paired set of features (nose, chin, forehead, eyes (including eyelids), ears (auricles), cheeks, lips); or with four or five characteristics of disfigurement. A maximum schedular 80 percent rating is warranted when there is visible or palpable tissue loss and either gross distortion or asymmetry of three or more features or paired set of features (nose, chin, forehead, eyes (including eyelids), ears (auricles), cheeks, lips); or with six or more characteristics of disfigurement. 38 C.F.R. § 4.118, DC 7800.

The eight characteristics of disfigurement, for purposes of evaluation under § 4.118, are: a scar of five or more inches (13 or more centimeters) in length; a scar at least one-quarter inch (.6 centimeters) wide at the widest part; surface contour of the scar elevated or depressed on palpation; a scar adherent to the underlying tissue; skin hypo-, or hyper-, pigmented in an area exceeding six square inches (39 square centimeters); abnormal skin texture (irregular, atrophic, shiny, scaly, etc.) in an area exceeding six square inches (39 square centimeters); underlying soft tissue missing in an area exceeding six square inches (39 square centimeters); indurated and inflexible skin in an area exceeding six square inches (39 square centimeters). 38 C.F.R. § 4.118, Note 1 following DC 7800. 

Disabling effects other than disfigurement that are associated with an individual scar of the head, face, or neck, such as pain, instability, and residuals of associated muscle or nerve injury are separately evaluated under the appropriate diagnostic code and 38 C.F.R. § 4.25 should be applied to combine the evaluation(s) with the evaluation assigned under this diagnostic code. Id., Note (4). 

DCs 7801 and 7802 pertain to burn scars, or scars due to other causes, not of the head, face, or neck. 38 C.F.R. § 4.118, DCs 7801 and 7802. 

Under DC 7804, one or two scars that are unstable or painful warrant a 10 percent rating. Three or four scars that are unstable or painful warrant a 20 percent rating. Five or more scars that are unstable or painful warrant a 30 percent rating. If one or more scars are both unstable and painful, 10 percent is to be added to the evaluation that is based on the total number of unstable or painful scars. Scars evaluated under DCs 7800, 7801, 7802, or 7805 may also receive an additional evaluation under this diagnostic code, when applicable. 38 C.F.R. § 4.118.

Under DC 7805, any disabling effects of other scars (including linear scars), and other effects of scars evaluated under DCs 7800, 7801, 7802, and 7804 not considered in a rating provided under DCs 7800-7804 are to be evaluated under an appropriate diagnostic code. 38 C.F.R. § 4.118.

Evidence relevant to the level of severity of the Veteran's pseudofolliculitis barbae includes a VA skin examination report dated in September 2015. During the September 2015 VA examination, the examiner reviewed the claims file and diagnosed pseudofolliculitis barbae with an onset of 1972. The Veteran reported that he used "Magic Shave" which helped lessen skin irritation and avoided using a razor due to his history of pseudofolliculitis barbae. 

The examiner noted that the skin condition did not cause scarring/disfigurement of the head, face, or neck and also noted that there were no benign/malignant skin neoplasms. The examiner did not note any systemic manifestations due to the skin disease. It was noted that the Veteran had not been treated with oral or topical medications in the past 12 months for his skin condition. It was also noted that the Veteran had not undergone any treatments or procedures other than systemic or topical medications in the past 12 months for exfoliative dermatitis or papulosquamous disorders. There were no debilitating or non-debilitating episodes in the past 12 months due to urticaria, primary cutaneous vasculitis, erythema multiforme, or toxic epidermal necrolysis. 

On physical examination it was noted that the Veteran's skin condition affected less than 5 percent of his total body area and less than 5 percent of his exposed area, specifically there were a few erythematous papules in the lower anterior neck area. There was no benign or malignant neoplasm or metastases related to the Veteran's skin disorder and no other pertinent physical findings, complications, conditions, signs and/or symptoms related to the skin condition. With regard to functional impact, the examiner wrote that the Veteran's skin condition did not impact his ability to work. 

Also of record is a September 2015 VA scar examination which was completed in connection with a claim for service connection for residuals of a right ring finger laceration. Significantly, this examination report shows that there are no scars or disfigurement of the head, face, or neck. 

After thorough consideration of the evidence of record, the Board concludes that an initial compensable disability rating for the Veteran's pseudofolliculitis barbae is not warranted in this case. Initially, with regard to DC 7806, the evidence does not show that the Veteran's skin disability covers more than 5 percent of the entire body or more than 5 percent of exposed areas are affected. As noted above, the September 2015 VA examination indicated that less than five percent of the Veteran's exposed areas were affected by his skin disability. The evidence also does not show constant or near-constant systemic therapy such as corticosteroids or other immunosuppressive drugs have been required during the past 12-month period. As noted above, during the September 2015 VA examination, the Veteran denied using medications for his skin condition and the September 2015 VA examiner specifically indicated that the Veteran had not been treated with oral or topical medications in the past 12 months for his skin condition. 

With regard to DC 7800 and 7804, the evidence does not show visible or palpable tissue loss and either gross distortion or asymmetry of two features or paired set of features, or one characteristic of disfigurement. The VA examiner specifically indicated that there were only a few erythematous papules in the lower anterior neck area. The September 2015 VA scar examination shows that there is no disfigurement of the head, face, or neck, or painful scarring. 

As for the lay assertions of record, the Board notes that the Veteran is certainly competent to report his own symptoms, or matters within his personal knowledge. See Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007); Buchanan v. Nicholson, 451 F.3d 1331, 1336 (Fed. Cir. 2006). In this case, the Veteran has complained of a skin disorder affecting his body. However, the Veteran has not endorsed any symptomatology that would warrant a compensable rating under any applicable diagnostic code. 

In reaching this decision, the Board considered the doctrine of reasonable doubt. However, as the preponderance of the evidence is against an initial compensable disability rating for pseudofolliculitis barbae, the doctrine is not for application. Gilbert; see also Hart, 21 Vet. App. at 509-10.

 B. Extraschedular Consideration

The Board has also contemplated whether the case should be referred for consideration of an extra-schedular rating. An extra-schedular disability rating is warranted if the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that application of the regular schedular standards would be impracticable. 38 C.F.R. § 3.321(b)(1). 

In Thun v. Peake, 22 Vet. App. 111, 115-16 (2008), the Court explained how the provisions of 38 C.F.R. § 3.321 are applied. Specifically, the Court stated that the determination of whether a claimant is entitled to an extra-schedular rating under 3.321 is a three-step inquiry. First, it must be determined whether the evidence presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. In this regard, the Court indicated that there must be a comparison between the level of severity and symptomatology of the claimant's service-connected disability with the established criteria found in the rating schedule for that disability. Under the approach prescribed by VA, if the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule, the assigned schedular evaluation is, therefore, adequate, and no referral is required. 

Second, if the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, the RO or Board must determine whether the claimant's exceptional disability picture exhibits other related factors such as "marked interference with employment" and "frequent periods of hospitalization." Third, when an analysis of the first two steps reveals that the rating schedule is inadequate to evaluate a claimant's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the claimant's disability picture requires the assignment of an extra-schedular rating. Id. 

The Federal Circuit recently held that 38 C.F.R. § 3.321(b)(1) "entitles a Veteran to consideration for referral for extra-scheduler evaluation based on multiple disabilities, the combined effect of which is exceptional and not captured by scheduler evaluations." Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014). However, in this case, there is no additional impairment that has not been attributed to a specific service-connected disability. Accordingly, this is not an exceptional circumstance in which extra-schedular consideration may be required to compensate the Veteran for disability that can be attributed only to the combined effect of multiple conditions.

The Board has carefully compared the level of severity and symptomatology of the Veteran's service-connected pseudofolliculitis barbae with the established criteria found in the rating schedule. In this regard, the specific diagnostic criteria regarding the skin adequately addresses the whole of the Veteran's symptoms referable to his pseudofolliculitis barbae, which includes percentage of the body area affected, the use of corticosteroids, and disfiguring and/or painful scars. There are no additional symptoms of the Veteran's service-connected pseudofolliculitis barbae to warrant an extra-schedular rating. 

Therefore, the Board finds that the rating criteria reasonably describe the Veteran's disability level and symptomatology associated with the service-connected pseudofolliculitis barbae addressed above. As such, the Board need not proceed to consider the second factor, viz., whether there are attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization. Consequently, the Board concludes that referral of this case for consideration of an extra-schedular rating for the service-connected pseudofolliculitis barbae at issue is not warranted. Id.; Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996); Floyd v. Brown, 9 Vet. App. 88, 96 (1996). 

Lastly, the Board has considered whether an inferred claim for a total disability rating based on individual unemployability (TDIU) under Rice v. Shinseki, 22 Vet. App. 447 (2009) has been raised. The record reflects the Veteran is retired and not currently employed fulltime; the evidence does not suggest that his retirement was related to his pseudofolliculitis barbae. Instead, the record reflects that the Veteran retired in August 2009 based on his age and years of service. Therefore, the Board finds that Rice is inapplicable as the issue of TDIU has not been raised.

ORDER

New and material evidence having been received, the appeal to reopen a claim of entitlement to service connection for hypertension is granted to this extent only.

New and material evidence having been received, the appeal to reopen a claim of entitlement to service connection for a left knee disability is granted to this extent only.

Service connection for diabetes mellitus is denied.

Service connection for hernia is denied.

Service connection for gum disease, to include loss of teeth from dental surgery, is denied.

An initial compensable disability rating for pseudofolliculitis barbae is denied.

REMAND

Although the Board regrets the additional delay, a remand is necessary to ensure that due process is followed and that there is a complete record upon which to decide the Veteran's remaining claims so that he is afforded every possible consideration. 38 U.S.C.A. § 5103A (West 2014); 38 C.F.R. § 3.159 (2015).

Initially, with regard to all remanded issues, the record shows that the Veteran served on temporary active duty in Kuwait in June/July 1994. If a veteran served in the Southwest Asia Theater of Operations during Operation Desert Shield/Storm than 38 C.F.R. § 3.317, a provision allowing service connection on the basis of a presumption must be considered. The presumption applies to chronic disabilities manifested either during active duty in the Southwest Asia Theater of Operations or to a degree of 10 percent or more by December 31, 2016. The "chronic diseases" specified in 38 C.F.R. § 3.317 include undiagnosed illness (§ 3.317(a)(2)(A) and medically unexplained chronic multisymptom illness (§ 3.317(a)(2)(B)). Such provisions should be considered by the RO on remand.

Also, the most recent VA treatment records are dated in June 2016. On remand, any VA records dated since June 2016 should be obtained. The Veteran should also be provided with an opportunity to identify any VA or non-VA treatment records pertaining to his remanded claims and, thereafter, all identified records should be obtained for consideration in his appeal. 

A. Hypertension

With regard to the hypertension issue, the Veteran submitted an initial claim for service connection for hypertension in April 1998. Service treatment records for the Veteran's period of active duty from 1972 to 1974 contain no complaint, clinical finding, or diagnosis of hypertension. Service treatment records for the Veteran's Reserve service, covering the period of 1974 to 1998, show that the Veteran had findings of high blood pressure at the time of physical examinations in May and June 1992 and in March and April 1994. At the time of earlier physical examinations in July 1986 and April 1990, the reports noted mild hypertension.

During the November 2006 Board hearing, the Veteran testified that he had been diagnosed with hypertension in 1992 during a Reserve physical examination. The Veteran also testified as to his belief that his hypertension was aggravated during his 20 plus years of service with the Reserves, to include a 30 day temporary assignment in Kuwait in 1994. Specifically, the Veteran reported that his Reserve service included a lot of stress and high temperatures and that he could not eat a diabetic diet during his Reserve service. 

During the September 2015 RO hearing, the Veteran testified that he was diagnosed with hypertension in 1976 after passing out during a period of Reserve service. The Veteran specifically stated that he did not notice any hypertension symptoms during his period of active service from 1972 to 1974. The Veteran also reiterated his belief that his hypertension was aggravated by his service in Kuwait to include heat, stress, and smoke from burning oil wells. 

In connection with the Veteran's claim, he submitted statements from Dr. J.L. dated in July 2009, November 2009, November 2013, and August 2015 which relate the Veteran's hypertension to the Veteran's military service. Unfortunately, there is no explanation as to whether the Veteran's hypertension is related to his active military service or subsequent Reserve service and no rationale for the opinion.

The Veteran has not yet been afforded a VA examination for the purpose of determining whether his current hypertension can be related to his active military service or a period of ACDUTRA. The Veteran's statements concerning in-service incurrence of hypertension along with the statements from Dr. J.L. are sufficient to trigger the duty on the part of VA to provide an examination as to this claim. McLendon v. Nicholson, 20 Vet. App. 79 (2006). Therefore, the Veteran should be afforded a VA examination so as to determine the nature and etiology of his hypertension.

B. Left knee

With regard to the left knee issue, the Veteran submitted an initial claim for service connection for a left knee disability in October 1997. Service treatment records for the Veteran's period of active duty from 1972 to 1974 contain no complaint, clinical finding, or diagnosis of a left knee injury or disability. Service treatment records for the Veteran's Reserve service, covering the period of 1974 to 1998, show that the Veteran reported experiencing left leg pain in August 1992 and February 1982 and March 1994 examination reports note a scar on the left knee.

During a September 2015 RO hearing, the Veteran testified that he injured his left knee in approximately July 1972 when he fell off a ramp with a wheelbarrow while performing mason work. He indicated that he was treated for this injury but X-rays were not taken and that, post-service, the first time he saw a doctor about his left knee was in the 1980s. VA treatment records show an impression of degenerative joint disease of the left knee as early as November 2007 and a January 2012 operative report shows repair of a left knee medial meniscus tear.

In connection with the Veteran's claim, he submitted statements from Dr. J.L. dated in July 2009, November 2009, November 2013, and August 2015 which relate the Veteran's left knee disability to the Veteran's military service. Unfortunately, there is no explanation as to whether the Veteran's left knee disability is related to his active military service or subsequent Reserve service and no rationale for the opinion. 

The Veteran has not yet been afforded a VA examination for the purpose of determining whether his current left knee disability can be related to his active military service or a period of ACDUTRA/INACDUTRA. The Veteran's statements concerning in-service incurrence of a left knee disability along with the statements from Dr. J.L. are sufficient to trigger the duty on the part of VA to provide an examination as to this claim. McLendon. Therefore, the Veteran should be afforded a VA examination so as to determine the nature and etiology of his left knee disability.

C. Left wrist

With regard to the left wrist issue, the Veteran submitted an initial claim for service connection for a left wrist disability in November 2007. Service treatment records for the Veteran's period of active duty from 1972 to 1974 show that the Veteran reported left wrist pain in July 1972. However, the Veteran's October 1973 separation examination shows normal upper extremities. Service treatment records for the Veteran's Reserve service, covering the period of 1974 to 1998, are negative for problems regarding the left wrist.

During a September 2015 RO hearing, the Veteran testified that he injured his left wrist while performing repetitive mason work in service. He was first treated for the left wrist in the 1980s. Post-service, he worked in warehouse personnel and also experienced a lot of repetitive work with his hands lifting 40 to 50 pound boxes. He indicated that he was diagnosed with arthritis of the left wrist in 2012/13. VA treatment records show an impression of degenerative joint disease of the left wrist as early as November 2007.

In connection with the Veteran's claim, he submitted statements from Dr. J.L. dated in July 2009, November 2009, November 2013, and August 2015 which relate the Veteran's left wrist disability to the Veteran's military service. Unfortunately, there is no explanation as to whether the Veteran's left wrist disability is related to his active military service or subsequent Reserve service and no rationale for the opinion. 

The Veteran has not yet been afforded a VA examination for the purpose of determining whether his current left wrist disability can be related to his active military service or a period of ACDUTRA/ INACDUTRA. The Veteran's statements concerning in-service incurrence of a left wrist disability along with the statements from Dr. J.L. are sufficient to trigger the duty on the part of VA to provide an examination as to this claim. McLendon. Therefore, the Veteran should be afforded a VA examination so as to determine the nature and etiology of his left wrist disability.

D. Neck, Right Shoulder, and Right Wrist

With regard to the neck, right shoulder, and right wrist issues, the Veteran submitted an initial claim for service connection for these disabilities in May 2015. Service treatment records for the Veteran's period of active duty from 1972 to 1974 are negative for complaints or treatment regarding the neck, right shoulder, or right wrist. Significantly, the Veteran's October 1973 separation examination shows a normal spine and normal upper extremities. Service treatment records for the Veteran's Reserve service, covering the period of 1974 to 1998, are also negative for problems regarding the right shoulder and/or right wrist but do show complaints of a sore neck in July 1994.

VA treatment records show generalized complaints of joint pain and notations of DJD (degenerative joint disease) since November 2007 but it is unclear whether the neck, right shoulder, and/or right wrist joints are affected. Significantly, a May 2012 VA treatment record shows complaints of neck, bilateral wrist, and generalized joint pain.

In connection with the Veteran's claim, he submitted statements from Dr. J.L. dated in July 2009, November 2009, November 2013, and August 2015 which relate the Veteran's "arthritis" to the Veteran's military service. Unfortunately, there is no explanation as to whether the Veteran's claimed neck, right shoulder, and/or right wrist disabilities are related to his active military service or subsequent Reserve service and no rationale for the opinion. 

The Veteran has not yet been afforded a VA examination for the purpose of determining whether his claimed neck, right shoulder, and/or right wrist disabilities can be related to his active military service or a period of ACDUTRA/ INACDUTRA. The Veteran's statements concerning in-service incurrence of such disabilities, the current medical records showing a generalized assessment of degenerative joint disease, along with the statements from Dr. J.L. are sufficient to trigger the duty on the part of VA to provide an examination as to this claim. McLendon. Therefore, the Veteran should be afforded a VA examination so as to determine the nature and etiology of his claimed neck, right shoulder, and/or right wrist disabilities.

E. Bilateral hearing loss

The threshold for normal hearing is from 0 to 20 decibels, and higher threshold levels indicate some degree of hearing loss. Hensley v. Brown, 5 Vet. App. 155, 157 (1993). For the purposes of applying the laws administered by VA, impaired hearing will be considered to be a disability when the auditory threshold in any of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz is 40 decibels or greater; or when the auditory thresholds for at least three of the frequencies 500, 1000, 2000, 3000, or 4000 Hertz are 26 decibels or greater; or when speech recognition scores using the Maryland CNC Test are less than 94 percent. 38 C.F.R. § 3.385.

The Court has held that service connection can be granted for a hearing loss where the Veteran can establish a nexus between his current hearing loss and a disability or injury he suffered while he was in military service. Godfrey v. Derwinski, 2 Vet. App. 352, 356 (1992). The Court has also held that VA regulations do not preclude service connection for a hearing loss which first met VA's definition of disability after service. Hensley, supra, at 159.

The Veteran contends that he currently has bilateral hearing loss as a result of his in-service exposure to excessive noise during his military service. Significantly, the Veteran is service connected for tinnitus. 

The Veteran's service treatment records are negative for hearing loss during active service. Significantly, an audiological examination report conducted during his enlistment in February 1972 reveals the following:

Puretone Threshold

500 Hz
1000 Hz
2000 Hz
3000 Hz
4000 Hz
Right Ear
10
5
5

5
Left Ear
5
5
5

5

In his February 1972 Report of Medical History the Veteran denied hearing loss. 

An audiological examination report at separation dated in October 1973 revealed the following:

Puretone Threshold

500 Hz
1000 Hz
2000 Hz
3000 Hz
4000 Hz
Right Ear
10
5
5

10
Left Ear
15
10
5

15

The Veteran's Reserve records are also negative for hearing loss. Specifically, examination reports dated from March 1978 to March 1994 show normal hearing and, in reports of medical history the Veteran denied "hearing loss." Significantly, audiological examination in March 1994 showed the following:

Puretone Threshold

500 Hz
1000 Hz
2000 Hz
3000 Hz
4000 Hz
Right Ear
5
0
0

0
Left Ear
0
5
20

0

The Veteran filed a claim for service connection for tinnitus in March 2011. In connection with this claim, he was afforded a VA audiological examination in October 2011. 

Puretone Threshold

500 Hz
1000 Hz
2000 Hz
3000 Hz
4000 Hz
Right Ear
10
10
15
10
20
Left Ear
10
10
20
25
15

Speech discrimination
Right Ear
96%
Left Ear
94%

The Veteran filed a claim for service connection for bilateral hearing loss in January 2016. In connection with this claim he was afforded a VA audiological examination in February 2016. Audiological testing revealed the following:

Puretone Threshold

500 Hz
1000 Hz
2000 Hz
3000 Hz
4000 Hz
Right Ear
30
30
40
50
60
Left Ear
40
40
50
50
60

Speech discrimination
Right Ear
80%
Left Ear
78%

Notably, this report shows bilateral hearing loss pursuant to 38 C.F.R. § 3.385. 
Therefore, as the Veteran has a current diagnosis of bilateral hearing loss, the remaining inquiry is whether such is related to his in-service noise exposure.

Based on a review of the claims file, the February 2016 examiner opined that the Veteran's bilateral hearing loss was less likely as not (less than 50/50 probability) caused by or a result of an event in military service. This opinion was based on the Veteran's normal hearing at entrance and exit. Unfortunately, the examiner did not address the slight shift when comparing the February 1972 and October 1973 active duty audiometric test results pursuant to Hensley. As such, an addendum opinion is necessary. 

Accordingly, the case is REMANDED for the following action:

1. The Veteran should be given an opportunity to identify any VA or non-VA healthcare provider who treated him for his claimed hypertension, left knee, left wrist, neck, right shoulder, right wrist, and bilateral hearing loss since service. After securing any necessary authorization from him, obtain all identified records not already contained in the claims file, to include any VA records dated since June 2016. 

For private treatment records, make at least two (2) attempts to obtain records from any identified sources. If any such records are unavailable, inform the Veteran and afford him an opportunity to submit any copies in his possession.

For federal records, all reasonable attempts should be made to obtain such records. If any records cannot be obtained after reasonable efforts have been made, issue a formal determination that such records do not exist or that further efforts to obtain such records would be futile, which should be documented in the claims file. The Veteran must be notified of the attempts made and why further attempts would be futile, and allowed the opportunity to provide such records, as provided in 38 U.S.C.A. § 5103A(b)(2) and 38 C.F.R. § 3.159(e).

2. Undertake appropriate efforts through appropriate official channels to verify whether the Veteran served on a period of ACDUTRA (active duty for training) or INACDUTRA (inactive duty training) for the time periods, (i) February 1982, (ii) July 1986, (iii) April 1990, (iv) May 1992 to June 1992, (v) August 1992, (vi) March 1994 to April 1994, and (vii) July 1994. Reports of retirement points are not helpful in this regards. Rather, the actual dates of service are needed. All efforts to obtain this information should be fully documented.

3. After obtaining any outstanding treatment records, schedule the Veteran for a VA hypertension examination to determine the current nature and etiology of his hypertension. The record, to include a copy of this Remand, must be made available to the examiner for review and the examiner must state in the examination report that the record has been reviewed. All indicated tests should be performed.

(a) The examiner should offer an opinion as to whether it is at least as likely as not that the Veteran's currently diagnosed hypertension is related to the Veteran's active military service from February 1972 to February 1974.

(b) The examiner should further consider whether the Veteran developed hypertension within one year of his separation from active military service in February 1974. In this regard, the examiner should opine as to whether it is at least as likely as not that the Veteran had hypertension within one year after February 1, 1974, his date of separation from service, and, if so, to describe the manifestations.

(c) The examiner should also offer an opinion as to whether it is at least as likely as not that the Veteran's currently diagnosed hypertension was incurred OR aggravated during the Veteran's reserve service during the periods, July 1986, April 1990, May 1992 to June 1992, or March 1994 to April 1994. 

The examiner should specifically address the statements from Dr. J.L. dated in July 2009, November 2009, November 2013, and August 2015 which relate the Veteran's hypertension to the Veteran's military service. 

A complete rationale should be given for all opinions and conclusions expressed. If the reviewer cannot provide any of the requested opinions without resort to speculation, that conclusion also should be explained.

4. After obtaining any outstanding treatment records, schedule the Veteran for a VA joints examination to determine the current nature and etiology of his claimed left knee, left wrist, neck, right shoulder, and right wrist disabilities. The record, to include a copy of this Remand, must be made available to the examiner for review and the examiner must state in the examination report that the record has been reviewed. All indicated tests should be performed.

(a) The examiner should identify all disorders found to be present involving the left knee, left wrist, neck, right shoulder, and right wrist (to include arthritis of the left knee and wrist as well as residuals of a left knee medial meniscus tear). With respect to each disorder diagnosed, the examiner should offer an opinion as to whether it is at least as likely as not related to the Veteran's military service from February 1972 to February 1974.

(b) The examiner should further consider whether the Veteran developed arthritis of the left knee, left wrist, neck, right shoulder, and/or right wrist within one year of his separation from military service. In this regard, the examiner should opine as to whether it is at least as likely as not that the Veteran had arthritis of the left knee, left wrist, neck, right shoulder, and/or right wrist within one year after February 1, 1974, his date of separation from service, and, if so, to describe the manifestations.

(c) The examiner should also offer an opinion as to whether it is at least as likely as not that a current disability of the left knee was incurred OR aggravated during the Veteran's reserve service during the periods, February 1982, August 1992, or March 1994. 

(d) The examiner should also offer an opinion as to whether it is at least as likely as not that a current disability of the neck was incurred OR aggravated during the Veteran's service during the period July 1994. 

(e) If any orthopedic condition is not attributable to a known diagnosis, the examiner should determine whether the Veteran's complaints of multi-joint pain constitute an undiagnosed illness consistent with the Veteran's Southwest Asia service.

The examiner should specifically address statements from Dr. J.L. dated in July 2009, November 2009, November 2013, and August 2015 which relate the Veteran's left knee, left wrist, and "arthritis" disabilities to the Veteran's military service. 

A complete rationale should be given for all opinions and conclusions expressed. If the reviewer cannot provide any of the requested opinions without resort to speculation, that conclusion also should be explained.

5. After obtaining any outstanding treatment records, obtain an appropriate medical opinion addressing the Veteran's bilateral hearing loss. The Veteran need not be re-examined unless an examination is deemed necessary. If a physical examination is deemed necessary, all indicated testing should be accomplished. The record, to include a copy of this Remand, must be made available to the examiner for review and the examiner must state in the examination report that the record has been reviewed. 

The examiner should opine whether it is at least as likely as not (50 percent or greater probability) that the Veteran's bilateral hearing loss is related to his military noise exposure? In so opining the examiner should do the following: (1) explain the significance of the absence or presence of threshold shifts and severity of such threshold shifts in regard to the likelihood military noise exposure caused permanent hearing damage; (2) explain the significance of normal hearing in regard to the likelihood military noise exposure caused permanent hearing damage, including addressing theories of delayed/latent onset of hearing loss. 

The examiner should specifically address the audiometric test results reflecting a slight upward shift in tested thresholds when comparing the February 1972 and October 1973 audiometric findings as well as the significant threshold shift when comparing the October 2011 and February 2016 audiometric findings. 

A complete rationale should be given for all opinions and conclusions expressed. If the reviewer cannot provide any of the requested opinions without resort to speculation, that conclusion also should be explained.

6. After completing the above actions, to include any other development as may be indicated by any response received as a consequence of the actions taken in the preceding paragraphs, the Veteran's claims should be readjudicated based on the entirety of the evidence. If the claims remain denied, the Veteran and his representative should be issued a supplemental statement of the case. An appropriate period of time should be allowed for response.

Thereafter, the case should be returned to the Board for further appellate consideration, if otherwise in order. The Board intimates no opinion as to the outcome of this case. The Veteran need take no action until so informed. The purpose of this REMAND is to ensure compliance with due process considerations. 

The appellant has the right to submit additional evidence and argument on the matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).

______________________________________________
TANYA SMITH
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs